THE DRIVER–HARRIS WIRE COMPANY

*v.*

WILLIAM B. DRIVER.

[Argued and decided October 3d, 1905.]

A contract for the purchase of defendant's stock in complainant corporation provided that defendant should not concern himself in the manufacture or sale of resistance or steel armature binding wire, &c., but might experiment in making such goods at his own expense, and, if the results of such experiments should meet complainant's approval, the latter would manufacture the goods, pay for selling the same, "and the profits thereon, after paying for the raw material," should be divided between the parties, &c. The contract also declared that such inventions and improvements subsequently made by defendant should belong to him, and, if complainant did not approve the same, defendant might make and sell the goods on his own account, paying ten per cent. of the selling price to complainant.—*Held*, that defendant, having invented a new wire, was not entitled to offer complainant as a compliance with the contract the material invented in a state ready to be drawn into wire, but was bound to disclose the formula and permit complainant to manufacture the same from raw materials.

On exceptions to answer to supplemental bill.

*Mr. Edward A. Day,* for the exceptant.

*Mr. Alfred F. Stevens, contra.*

PITNEY, V. C.

I am asked to give my reasons, for the purposes of appeal, for sustaining the exceptions to the answer to the supplemental bill.

The object of the original bill, filed May 15th, 1905, was to enforce by preventing the breach by the defendant of a contract entered into between the parties hereto on the 16th of February, 1905, and consummated on or about the 5th of April, 1905.

The defendant was the president of the complainant corpora-

tion and largely interested in its capital stock, and by the agreement he conveyed to complainant all his stock, for the sum of $60,000, payable in installments as specially provided in the agreement.

Then follows an agreement on the part of the defendant that he will not,

"for a period of fifteen years, from April 1st, 1905, engage, directly or indirectly, or concern himself in carrying on or conducting the business of making or selling *resistance or steel armature binding wire, sheet or strip, or any brass or copper wire, sheet or strip,* or so-called antique bronze wire, or bronze wire made, approximately, of seven (7) per cent. of tin and ninety-three (93) per cent. of copper, and imported from Germany, in competition with the business of the said company in"

certain of the states of the United States.

Then follows this further clause:

"But the party of the first part has the privilege of experimenting in the making of the above-mentioned goods, at his own expense, and, if the *products and results resulting from such experiments* shall meet the approval of the said company, then the said company shall furnish the machinery and labor for the manufacture of such goods, and the party of the first part shall pay the expense of selling the said goods, *and the profits thereon, after paying for the raw material, shall be divided equally* between the said wire company and the party of the first part, it being understood that the party of the first part shall have the right to fix and determine the selling prices for said goods; but if the said company does not approve the said goods, and is unwilling to manufacture them on the terms above stated, then the party of the first part may make and sell such goods on his own account, and agrees to pay ten (10) per cent. of the selling price to the said wire company, rendering a full and true account of all sales every six months to the said company; it being understood that all inventions, discoveries, developments and improvements growing out of the experiments of the said party of the first part shall belong to him, and that the said company shall not attempt to infringe the same; and that the wire company will not experiment or attempt improvements in alloys for resistance wire, sheet or strip, during the term of this agreement, unless the party of the first part shall have abandoned his experiments in the making of such alloys and shall have so notified in writing the wire company.

"And the said wire company, in consideration of the sale of said stock as herein provided, and in consideration of the party of the first part refraining from competition as above provided, hereby agrees to pay to the said party of the first part the sum of twenty-five hundred ($2,500) dollars per annum for ten (10) years, from April 1st, 1905, in semi-monthly installments, and the party of the first part agrees that he will

do all in his power to assist the welfare of the said company by advice regarding business methods and customers at any time that he is consulted by the wire company or its officers."

The bill charged specific breaches of this agreement, commencing almost immediately after the 5th of April, 1905.

An answer was filed on the 13th of June. Affidavits were annexed to each and arguments were had thereon.

The supplemental bill was filed September 11th, 1905, and the answer to it on September 20th.

Exceptions were immediately filed to this answer for insufficiency; were promptly brought to hearing, and sustained on the 3d of October.

The answer to the original bill, and statements and admissions by counsel at the argument, informed the court as to the meaning of the technical words used in the contract.

The supplemental bill recites the original bill and the contract, and, after referring especially to the provision that the defendant might experiment as therein set forth, and alleging that by the true meaning and construction of the contract any inventions, discoveries, developments and improvements by the defendant must possess substantial novelty and must be useful and new to the trade, it proceeds to state that since the filing of the original bill defendant had offered to complainant certain formulas for the making of resistance wire, giving the composition of those, and then contains this clause, "and also a resistance material composed of copper, nickel and manganese, in proportions unknown to your orator," which the said defendant claims gives a resistance of about four hundred and twenty-five ohms per mil-foot, or about forty times that of copper, and which will not rust, and has a higher resistance than any metal on the market which will not rust, which he claims to be improvements in resistance wires produced as the result of his experiments.

The supplemental bill then charges that the defendant claims that any change in any of the articles which by the contract defendant is prohibited from selling, however unsubstantial or unimportant it may be, gives to the defendant the right, under

the contract, to join with the complainant in its manufacture and sale.

The bill then alleges the continued breach by the defendant of the contract, and prays relief against the clause giving the defendant an annuity of $2,500; and claims the right, pending the litigation arising out of the pleadings, to abstain from deciding whether to accept or decline the offers of defendant of new inventions.

In its prayer for answer the complainant asks as follows:

"And more especially that he shall set forth and discover the formula, alloy and ingredients in their relative proportions of the resistance material of copper, nickel and manganese which he claims gives a resistance of about four hundred and twenty-five ohms per mil-foot, or about forty times that of copper, and which will not rust, mentioned and set forth in the foregoing bill, and also mentioned in a letter from him to your orator bearing date on or about the twenty-eighth day of August, 1905."

The defendant by his answer declines to answer this interrogatory in the following language:

"And this defendant denies the right of the complainant to insist upon the disclosure of the proportions of copper, nickel and manganese contained in the last product offered to it by this defendant, for the reason that the product, by the terms of the contract, is his, and if it differs in the results it accomplishes from the products of the complainant, so that it is demonstrated to be an improvement, he is entitled to offer the same, as he has done, in *the shape of wire*, to the complainant, which can be tested and found to accomplish what he has stated it will accomplish."

The reason given by defendant in his answer, and at the argument, for declining to disclose the proportions of the composition of the alloy is that it is not necessary for the complainant, and it is under no obligation to furnish the raw product—whatever that may mean—required for the manufacture of defendant's improved product, and if defendant provides such product there will be no necessity for complainant knowing its composition, and charges that complainant intends to disclose the secret of his goods and have them known to the public, and thereby the value of them will be lost to him.

In his argument he further alleged that the value of his

products could be determined by experiments in testing its power of resistance.

Before measuring the value of this argument, I shall state that an examination of the pleadings, together with the statement and admissions of counsel made at the argument (and without relying upon the knowledge derived by me from a reading of the numerous affidavits presented to the court before the hearing on the exceptions, including the oral examination of witnesses on a motion for a judgment of contempt against the defendant for a breach of the injunction issued against him), shows that the meaning of the words in the contract "resistance or steel armature binding wire, sheet or strip, or any brass or copper wire, sheet or strip," is some alloy of copper used in the manufacture of electrical apparatus which does not conduct electricity as freely as does pure copper, and hence is called a "resistance" wire, sheet or strip.

Copper is the best conductor of electricity and is used in the art as a standard of least resistance, and different alloys of it are made with varying degrees of resistance. The different materials which produce these alloys are tin, zinc, steel, manganese, nickel, and I believe some others, and they may be mixed with almost infinite variety of relative proportions.

The complainant claims in argument that the words above quoted include substantially any and every alloy of copper, since unless it be in some manner alloyed it will not be properly termed a resistance wire, sheet or strip. I express no opinion on this claim at this time.

On the merits of the exception the complainant claims that it cannot judge of the value of any new alloy presented to it without knowing the proportions of its ingredients, and that if a sample be furnished, as it must necessarily be, it would have the clear right to analyze it to ascertain its component parts, and that it should not be subjected to that expense and trouble.

In answer to defendant's argument that it is not necessary for the complainant to furnish or provide the "raw product," since the defendant can do so and is willing to do so, the complainant says that the provision of the contract in question is that the complainant shall furnish the machinery and labor for the

manufacture of such goods, and that that provision implies not only a duty on the part of the complainant to manufacture, but a privilege on its part so to do, and thereby save all the profits that arise from the manufacture, which includes, of course, the mixing of the alloy and the putting it into the shape of thin billets or rods, ready to be drawn out into wire or sheets or strips, as may be demanded by the trade. Further, it argues that if it manufactures the goods it is responsible to the trade for their character and composition. To this the defendant answers in argument that the character and quality of the goods may be determined by complainant by actual test of its powers of resistance to the current of electricity.

I thought at the argument, and still think, that the contentions of the complainant in this behalf were sound and unanswerable.

The offer of the defendant—I so construe the answer—to furnish the "raw product," by which I understand he means the billets or rods ready to be drawn into wire, sheets or strips, is clearly inadmissible, since it would put the complainant at the mercy of the defendant in the matter of price to be charged for it.

The clear spirit of the agreement is that the complainant has the liberty to go into the original market and buy the raw material and combine it and manufacture it as cheaply as possible, and for that purpose it is quite clear that it is entitled to know what those raw materials are, and in what proportions they should be combined. And here certain language in the agreement is significant, namely, "and the profits thereon, after paying for the *raw material,* shall be divided equally," &c. Now, the words "raw material" there undoubtedly mean the several articles of which the alloy is to be composed, and cannot mean the billets and rods ready to be drawn into wire, which I infer was intended by the words "raw product" used by the defendant. And over and above all complainant is entitled to know those proportions for the purpose of judging and determining whether they wish to undertake the manufacture or not.

In short, the practical result of adopting the construction claimed by the defendant would be to give him the opportunity

to gradually enter into competition with the complainant in the manufacture of all sorts of "resistance wire, strips and sheets," upon condition that he pay the complainant ten per cent. of the selling price thereof.